# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00567-CV

**Emerson Construction Company, Inc. and Western Surety Company, Appellants**

**v.**

**Ranger Fire, Inc., Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
## NO. 220,264-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Emerson Construction Company, Inc. (Emerson) and Western Surety Company, Emerson's bond surety, appeal from the trial court's judgment, rendered on a jury verdict in favor of appellee Ranger Fire, Inc. (Ranger). In seventeen issues, appellants challenge Ranger's theory of recovery, the measure of damages, the jury charge, the legal and factual sufficiency of the evidence, and the award of attorney's fees. For the reasons that follow, we affirm the trial court's judgment.

## BACKGROUND

*The Project*

Emerson was the general contractor, and Ranger a subcontractor, on a construction project to build a Wal-Mart Super Center in Center, Texas. Emerson executed its agreement with Wal-Mart in January 2004, and the agreement included the American Institute of Architects (AIA)

General Conditions and provided a substantial completion date of September 10, 2004.[1]  In March 2004, Emerson and Ranger executed a corresponding subcontract in which Ranger agreed to supply and install the fire suppression system for the store in exchange for the sum of $145,000.  The subcontract also references and incorporates the contract between Emerson and Wal-Mart.

The project initially was delayed for several months.  Although Emerson did not request and Wal-Mart did not issue a change order for a new substantial completion date, they ultimately agreed to December 13, 2004.  Ranger was not responsible for this delay, and Emerson provided updated schedules to Ranger during the course of the project, revising the time period for the fire suppression system's installation.  Because installation of the fire suppression system depended on Wal-Mart and other trades' completed work, its installation was scheduled from the mid-point to the end of the project.  Ranger delivered materials to the construction site in July 2004 and began installing the system in September 2004.

Emerson provided a written representation to Wal-Mart on December 13, 2004, that the project, including the fire suppression system, was "totally completed," certified that all subcontractors had been paid, and issued a "statement of warranty" that the "work performed" on the project complied with the contract specifications and that "the warranty period extends one (1) year beyond the date of Substantial Completion of 12-13-04." Emerson warranted that it would "correct any defects to material and equipment within one (1) year from the date of Substantial Completion

---

[1]  Substantial completion is defined in the AIA General Conditions as "the stage in the progress of the Work when the Work or the designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended purpose."

2

at no expense to owner." Wal-Mart obtained a temporary certificate of occupancy, took possession of the store, and began moving merchandise into the store at that time. As of December 13, Emerson had open payment applications to Wal-Mart, and Ranger had corresponding open payment applications to Emerson.

Emerson and Ranger worked together on the project until January 3, 2005. After that date, Ranger did not perform any further work on the project, and Emerson hired another subcontractor, Northstar Fire Protection (Northstar), to take Ranger's place. Northstar began working on the job site on January 5, 2005, and continued to work there for several months after Wal-Mart opened the store to the public.[2] Emerson ultimately paid Northstar approximately $96,900 for its work on the fire suppression system.

*The Parties' Dispute*

The parties' dispute arose after BSW International, Wal-Mart's architect and engineer of record, prepared observation reports from two inspections of the fire suppression system. BSW International inspected the fire suppression system on December 7, 2004, and created a "Fire Sprinkler System Site Observation and Acceptance Test Report," identifying approximately 90 open items. BSW International performed a second inspection of the fire suppression system on December 27, 2004, and created a supplemental report, identifying approximately 70 open items.

---

[2] The fire marshal tested and certified the fire suppression system on January 20, 2005. A certificate of occupancy was issued the following day, and the store opened to the public on January 26, 2005.

Based upon the inspection reports and a contractual notice provision, Emerson provided notice to Ranger that it had 72 hours to complete the open items.[3] In the evening of December 27, 2004, Bruce Raney, Emerson's project manager, sent a letter to Daniel Shipman,

---

[3] The notice provision provides in relevant part:

[I]f Subcontractor shall fail to furnish materials of the quality to do work in the manner required by the General Contract, or if Subcontractor shall fail to provide workmen in numbers and experience and equipment in kind and capacity suitable to the Architect, Owner or Contractor, or if Subcontractor shall fail to keep pace with the progress schedule formulated from time to time by the Contractor or delay or impede the work of any other contractor or subcontractor employed on said Project, or if Subcontractor shall fail in any other manner to perform the whole or any part of the covenant or agreement contained or assumed herein, then and upon the occurrence of any such event (and the Contractor's findings and judgment with respect thereto shall be final and bind the Subcontractor absolutely), Contractor shall have the right, after sending the Subcontractor notice of its intention by mail or telegraph seventy-two (72) hours in advance:

(a)     to provide materials and labor in addition to or in place of any supplied by Subcontractor and deduct the cost thereof and expense relating thereto from the contract price payable hereunder, and after or without exercising said privilege, also

(b)     to bar Subcontractor from said Project . . . and take over and complete the work covered hereby either by itself or by contracting with others to do so . . . all at the expense of the Subcontractor, and for that purpose to take possession of, use and consume . . . . materials, tools, appliances, machinery, equipment, and facilities of Subcontractor . . . .

The AIA General Conditions provide written notice by certified mail or hand delivery:

Written notice shall be deemed to have been duly served if delivered in person to . . . an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

4

Ranger's field superintendent, by facsimile and, on the following day, by certified mail. In the letter, Raney stated:

> This letter shall serve as your seventy-two hour notice to correct the following items immediately.
> Failure to complete the project as specified and scheduled
> Failure to notify Emerson your work was not complete for the scheduled final inspection by the Owner

Attached to the letter was the observation report prepared earlier that day. Raney states that Emerson would "begin assisting your firm" no later than January 3, 2005, and that "all costs associated with the assistance [would] be deducted from Ranger's contract funds." Ranger received the certified letter with the report on January 3, 2005.

After receiving the certified letter on January 3, 2005, Clay Shipman, Ranger's president, contacted Bruce Raney by phone. Letters between the parties were exchanged as well on that day and on the following day setting out the parties' respective positions. At some point between December 27, 2004, and January 3, 2005, Emerson removed Ranger's supplies and materials from the job site. In his letters to Emerson, Shipman stated that Ranger "would have been finished all ready [sic] but someone signed the materials that we have not received," the "last inspection failed due to you calling in the inspection and us not being ready," Ranger "lacked completing a small portion of an engineer's punch list," and "Ranger had a four man crew there January 3, 2005, and scheduled to be done Thursday, January 6, 2005." Shipman also stated that Ranger did not receive the 72-hour notice letter until January 3, 2005, and that "we intend on completing the punch list within this time. Unfortunately, Emerson has taken material back to

Temple and we are in need of this material. Our 72 hours should not start until we get the material back."

Shipman further raised Emerson's failure to pay outstanding progress payment applications. Pursuant to the agreement, Emerson agreed to make progress payments to Ranger during the course of construction after receiving the corresponding amounts from Wal-Mart. Ranger submitted payment applications to Emerson during the course of the project, and Emerson made three progress payments to Ranger. Ranger also submitted payment applications for labor in September, October, November, and December, but Emerson did not pay those applications. Emerson initially withheld any payments after the beginning of September because Wal-Mart had rejected "as built" drawings submitted by Ranger. After receiving a separate 72 hour notice letter sent by facsimile in October 2004 concerning the drawings, Ranger responded by letter with a November 2004 completion schedule and resubmitted the drawings. Wal-Mart approved the drawings in November 2004.

In his letters to Ranger, Raney stated that Ranger had abandoned the project and that "all costs associated with supplementing your forces will be the responsibility of Ranger Fire." As a condition to Ranger returning to work on the project, Emerson required Ranger to "request permission in writing to return," Ranger's work to be inspected by another fire suppression contractor, and Ranger to report to the other fire suppression subcontractor. Raney also raised damages from water leaks in the fire suppression system. Ranger did not agree to Emerson's conditions, and the parties were unable to reach an agreement that would allow Ranger to continue to work on the project.

*Litigation Commenced*

Ranger filed suit against Emerson and Western Surety Company in November 2006. Ranger's claims included fraud and breach of contract based upon Emerson's failure to pay and its actions surrounding its notice letter dated December 27, 2004. Among its requests for relief, Ranger sought the balance owed under the subcontract. Ranger also sought to foreclose on the bond filed by Emerson, as principal, and Western Surety, as surety.[4]

Emerson and Western Surety answered, asserting affirmative defenses. Emerson also counterclaimed for breach of contract. Emerson contended that Ranger performed its work in a defective manner and abandoned the project. Emerson sought damages for: (i) the amount that Emerson paid to Northstar offset by the remaining amount owed to Ranger under the subcontract, (ii) the costs and expenses to correct alleged failures in the fire suppression system as installed by Ranger, and (iii) amounts paid to Wal-Mart for flood damage from the alleged failures. Ranger answered the counterclaim, asserting affirmative defenses, including that it was excused from further performance by Emerson's prior material breach. Both sides sought attorney's fees and costs.

*The Trial*

The seven-day jury trial occurred in April 2009. Many facts were not disputed at trial, including the amounts paid by Emerson to Ranger and the balance owed under the subcontract, Emerson's removal of Ranger's materials from the job site prior to January 3, 2005, and Emerson's conditions at that time for Ranger to continue to work on the project. The primary factual disputes

---

[4] Ranger had filed a mechanic's lien against the project after Emerson did not pay Ranger's progress payment applications, and Emerson subsequently filed the bond to indemnify the lien claim.

were (i) the status of the project, particularly the fire suppression system, on December 13, 2004, when Emerson represented that the project was substantially complete and issued its warranty and Wal-Mart took possession; (ii) the status of the project and Ranger's work on January 3, 2005, the last day that Ranger was at the job site; (iii) the scope of the open items identified in the observation reports dated December 7 and 27, 2004; and (iv) the parties' actions surrounding Emerson's notice letter dated December 27, 2004.

Ranger's witnesses included Bruce Raney; Clay Shipman; Roger Pichardo, Ranger's corporate representative who was present at the December 27, 2004, inspection; Jim Smith, the construction manager for Wal-Mart; James Mulkey, Emerson's project superintendent who also was present at the December 27, 2004, inspection; Chuck Emerson, Emerson's president and an owner, and Thomas Izbicki, an expert on fire suppression systems. Ranger presented evidence to support the amount that it claimed was owed to it under the subcontract and its compliance with the subcontract, including its work on the system and it actions surrounding the notice letter dated December 27, 2004. Ranger also presented evidence to support its positions that it could have completed the open items on the observation report within 72 hours if Emerson had given it the chance and that it did not have actual notice of the letter dated December 27, 2004, until January 3, 2005. Ranger further presented evidence challenging the necessity and reasonableness of the cost and scope of Northstar's work, particularly concerning the incurred cost to find and

8

retrieve "coupons" in the system.[5] Northstar utilized a robot/video system. Ranger contended that this process was unnecessary and the cost unreasonable.

Emerson presented contrary evidence to support its contentions that the notice letter dated December 27, 2004, complied with the subcontract, that Ranger failed to substantially complete the fire suppression system, that Ranger's work was defective, and that Emerson had no choice but to replace Ranger with Northstar when it made the decision to do so. Emerson also presented evidence to support its request for damages, including the cost to complete the fire suppression system and to rectify damage from Ranger's defective work. Emerson's witnesses included Brandon Pierce, the fire protection field technician for BSW International who performed the inspections and created the corresponding observation reports in December 2004; Chrisha Potter, Emerson's controller and corporate treasurer who testified concerning payments made to Ranger, Northstar, and Wal-Mart and to the damages Emerson was seeking; Daniel Shipman, Ranger's field superintendent who testified by deposition; and Albert W. Reed III, an expert on fire suppression systems.

Witnesses from both sides characterized the open items from the observation reports as "punch list" items but disagreed whether the items were minor, major, or cosmetic, the length of time that Emerson should have given Ranger to complete the open items, and the amount of time that it would have taken Ranger to complete the open items. The parties' experts provided competing opinions. Although neither expert personally observed the fire suppression system during the

---

[5] A coupon is a "cutout of the sidewall of the pipe in order to attach a branch line or an additional main feed of pipe from a main line."

relevant time period, Ranger's expert Izbicki inspected the system after he was retained and testified that the lists on the observation reports were punch lists and opined that, as of December 27, "it appears that most of what was still left on that punch list was relatively minor or cosmetic" but that "[t]here were a few, kind of collective, maybe major, issues." He estimated that it would take more than two hours to complete "major" items and less than one hour for "minor" and "cosmetic" items. He also opined that the reference to "work ongoing" in the observation reports was to work that other trades needed to complete before Ranger could complete its work and that Ranger could have completed the remaining items on the December 27, 2004, observation report within 72 hours. In contrast, Emerson's expert Reed opined that many of the items were more than punch list items, that the fire suppression system was not functioning as of December 27, 2004, and that Ranger did not substantially complete the installation of the fire suppression system in accordance with the subcontract. Reed, however, did not visit the job site at any time.

Over 300 exhibits were admitted into evidence, including the subcontract, copies of the December 7 and 27, 2004, observation reports, the correspondence between the parties surrounding the notice letter dated December 27, 2004, documentation surrounding the substantial completion date of December 13, 2004, the various schedules and status reports prepared by Emerson and Wal-Mart concerning the project's progress, including the fire suppression system, and photographs taken on December 13, 2004, and January 3, 2005.

At the close of the evidence, the trial court refused to submit Ranger's fraud claim and submitted the case to the jury under competing breach of contract claims. The jury found that both Ranger and Emerson failed to comply with the subcontract but that Ranger's failure to comply

10

was excused and Emerson's failure to comply was not excused. The jury found that Ranger had been damaged in the amounts of $27,399.53 for the "remaining amount owed from Emerson Construction to Ranger Fire under the Subcontract Agreement, including payments from September, October, November and December" and $14,500 for the "retainage owed from Emerson Construction to Ranger Fire under the Subcontract Agreement."

Appellants filed a motion for judgment notwithstanding the verdict, and Ranger filed a motion for entry of judgment based upon the jury's verdict. The parties also submitted the issue of attorney's fees to the court. After several more hearings, the trial court rendered final judgment in July 2009, awarding Ranger the amount of $41,897.53 as actual damages, plus attorney's fees, interest, and costs. Emerson filed a motion for new trial. After a further hearing, the trial court denied the motion. This appeal followed.

## ANALYSIS

In seventeen issues, Emerson and Western Surety challenge the theory of recovery, the measure of damages, the jury charge, the sufficiency of the evidence to support the jury's findings, and the award of attorney's fees.

### *Theory of Recovery*

In their first and third issues, appellants challenge Ranger's breach of contract theory of recovery. They contend that Ranger was precluded from recovering for breach of contract because Ranger's work was not complete and did not comply with the subcontract specifications and, therefore, that Ranger was limited to pursuing its claims based upon quantum meruit, substantial

performance, or wrongful interference breach of contract. Appellants also contend that Ranger cannot recover under a substantial performance theory because Ranger did not offer evidence or obtain affirmative answers to jury questions related to substantial performance or the cost of remedying defects in the fire suppression system as installed by Ranger.

In the context of a contract dispute between a subcontractor and a contractor, substantial performance is an equitable doctrine that allows a subcontractor who has breached the parties' agreement but nevertheless substantially completed the project to recover under the contract. *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990); *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 481 (Tex. 1984); *RAJ Partners, Ltd. v. Darco Constr. Corp.*, 217 S.W.3d 638, 643 (Tex. App.—Amarillo 2006, no pet.). The doctrine of quantum meruit applies outside the express terms of a contract and allows a subcontractor to recover the reasonable value of services provided less any damage suffered. *Dobbins*, 785 S.W.2d at 378; *see Gentry v. Squires Constr.*, 188 S.W.3d 396, 402-03 (Tex. 2006); *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988). Ranger did not pursue claims against appellants based upon either quantum meruit or substantial performance but based upon breach of contract.

"The elements of a breach of contract claim are (i) the existence of a valid contract between the plaintiff and defendant; (ii) the plaintiff performed; (iii) the defendant breached the contract; and (iv) the plaintiff was damaged as a result of the breach." *Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 815 (Tex. App.—Dallas 2003, pet. denied) (citation omitted). A contracting party who is in default cannot maintain a suit for breach. *Dobbins*, 785 S.W.2d at 378. However, "[i]t is a fundamental principle of contract law that when one party to a contract commits

a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *see Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 689 (Tex. 1981) (breach of a contract by one party excuses performance by other party). Further, when one party to a contract, by wrongful means, prevents the other party from performing, this interference with performance constitutes breach of contract. *See Tacon Mech. Contractors v. Grant Sheet Metal*, 889 S.W.2d 666, 670 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (contractor's termination of subcontractor was breach of contract and subcontractor entitled to recover damages sustained by the breach).

Here, Ranger asserted, among its pleaded claims, that it was excused from continued performance under the subcontract when Emerson materially breached the subcontract. *See Mustang Pipeline Co.*, 134 S.W.3d at 196. Ranger also pleaded that Emerson breached the subcontract by (i) "effectively forc[ing]" Ranger "off the Project without having the opportunity to complete the Project pursuant to the [subcontract]" and (ii) when "Emerson terminated Ranger Fire, removing its remaining materials from the site and refusing Ranger Fire further access to the site." *See Tacon Mech. Contractors*, 889 S.W.2d at 670. We conclude that Ranger pleaded and pursued a valid breach of contract theory of recovery. *See Mustang Pipeline Co.*, 134 S.W.3d at 196; *Dobbins*, 785 S.W.2d at 378; *Tacon Mech. Contractors*, 889 S.W.2d at 670. We overrule appellants' first and third issues.

***Measure of Damages and Jury Charge Error***

In their second, fourth, and sixth issues, appellants challenge the measure of damages. Similar to appellants' first and third issues, these issues focus on Ranger's failure to complete its

work under the subcontract. Appellants contend that Ranger cannot recover under a wrongful interference breach of contract theory because Ranger did not offer evidence or obtain an affirmative answer to jury questions related to Ranger's cost to complete or correct its subcontract work. Based upon the same reasoning, appellants also contend that the trial court applied an improper measure of damages, failed to instruct the jury as to the proper measure of damages for breach of contract, and abused its discretion by overruling appellants' objections to Ranger's damage question.

### a) Measure of Damages

Whether the trial court erred in applying an improper measure of damages is a question of law subject to de novo review. *C. C. Carlton Indus. v. Blanchard*, 311 S.W.3d 654, 662 (Tex. App.—Austin 2010, no pet.); *Matheus v. Sasser*, 164 S.W.3d 453, 458 (Tex. App.—Fort Worth 2005, no pet.). We begin then by determining the applicable measure of damages.

When a contractor has materially breached an agreement with its subcontractor excusing further performance by the subcontractor, the subcontractor's measure of damages under a breach of contract claim generally is the contract price less what would have been the cost to the subcontractor to complete its work. *Kleiner v. Eubank*, 358 S.W.2d 902, 905 (Tex. Civ. App.—Austin 1962, writ ref'd n.r.e.); *Tower Contracting Co. v. Flores*, 294 S.W.2d 266, 272-73 (Tex. Civ. App.—Galveston 1956), *aff'd as modified*, 302 S.W.2d 396 (Tex. 1957); *see also Another Attic, Ltd. v. Plains Builders, Inc.*, No. 07-08-0312-CV, 2010 Tex. App. LEXIS 9620, at *9-10 (Tex. App.—Amarillo Dec. 6, 2010, no pet.) (mem. op.) (comparing substantial performance and wrongful interference breach of contact measures of damages). This measure of damages comports with the general rule for breach of contract damages that "the complaining party is entitled to recover the

amount necessary to put him in as good a position as if the contract had been performed." *See Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citation omitted) (measure of damages for breach of contract is "just compensation for the loss or damage actually sustained, commonly referred to as the benefit-of-the-bargain"). In this context, we turn to appellants' issues challenging the jury charge.

### b) Standard of Review

We review complaints of error in the jury charge under an abuse of discretion standard. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 387 (Tex. App.—Austin 2001, pet. denied). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or when it acts without reference to any guiding rules and principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

To reverse a judgment based on a claimed error in the jury charge, a party also must show that the error probably resulted in the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (error in refusing an instruction reversible if it probably caused rendition of improper judgment); *Niemeyer*, 39 S.W.3d at 387 (error in jury charge reversible only if it amounts "'to such a denial of rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment'") (citation omitted). To determine whether an alleged error in the jury charge is reversible, the reviewing court must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n.*, 710 S.W.2d 551, 555 (Tex. 1986).

c)      *Challenge to Ranger's Measure of Damages*

Appellants challenge the instruction to the jury concerning the elements of Ranger's

damages.  Question 4 with its instructions stated:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Ranger Fire for its damages, if any, that resulted from [Emerson's] failure to comply?

Consider the elements of damages listed below and none other.  Consider each element separately.  Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. . . .

Answer separately in dollars and cents for damages, if any.

a.      The remaining amount owed from Emerson Construction to Ranger Fire under the Subcontract Agreement, including payments from September, October, November and December.

b.      The retainage owed from Emerson Construction to Ranger Fire under the Subcontract Agreement.

The jury answered $27,399.53 and $14,500 respectively.

At the charge conference, appellants objected to Question 4 as follows:

Your Honor, with regard to Question Number 4, the Defendant would object that there is – is no evidence to support recovery of the full contract price because testimony indicated that Ranger Fire did not substantially comply with their obligations and, therefore, the specific objection would be to the instruction under damages referring to the jury that they can consider amounts from the September, October, November and December as well as retainage, which represents 100 percent of the contract price.  And we don't believe that that is an appropriate instruction on Ranger Fire's damages, and that there should be – or that instruction, at the very least, should include or indicate costs associated with either the completion or the correction or the remedy of those damages.  And in addition, because of the losses outside the contract that occurred because of the failures, the cap failures and those kinds of losses, we would object that – that Ranger Fire's damage question does not

16

also include a reference to those kinds of offsets that the jury could consider, and so we would object that Question Number 4 is not appropriate on those grounds as well, your Honor.

Rules 277 and 278 of the Rules of Civil Procedure require trial courts, "whenever feasible, [to] submit the cause upon broad-form questions" and to submit questions, instructions, and definitions to the jury "which are raised by the written pleadings and the evidence" and necessary to enable the jury to render a verdict. Tex. R. Civ. P. 277, 278; *see Goose Creek Consol. Indep. Sch. Dist. v. Jarrar's Plumbing, Inc*., 74 S.W.3d 486, 499 (Tex. App.—Texarkana 2002, pet. denied). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Union Pac. R.R. Co.*, 85 S.W.3d at 166 (citing Tex. R. Civ. P. 278).

Ranger pleaded that Emerson failed to make payments due under the subcontract and that, "[a]fter allowing all just and lawful offsets, payments, and credits, Emerson is indebted to Ranger Fire in the principal sum of $48,177.53." Emerson does not dispute that the amount of $48,177.53 remained open under the subcontract. The evidence showed that Ranger submitted monthly payment applications for labor and retainage to Emerson from September through December 2004 and that Emerson did not pay the requested amounts. Given Ranger's pleadings and this evidence, we cannot conclude that the trial court abused its discretion by instructing the jury to consider remaining amounts owed under the subcontract as elements of Ranger's damages.

Appellants also contend that Ranger should have requested and the trial court should have included a question on Ranger's cost to complete or correct its remaining work. But, even if we were to conclude that appellants preserved this complaint and that the trial court abused its discretion by not including a separate question or instructing the jury to consider Ranger's cost to

complete or correct its work, we also would have to conclude that the trial court's error probably resulted in an improper judgment to reverse the jury's findings.[6] *See* Tex. R. App. P. 44.1(a); *Goose Creek Consol. Indep. Sch. Dist.*, 74 S.W.3d at 500 (where instruction is defective in stating proper measure of damages, error is subject to harmless error review).

Here the jury found an amount less than the subcontract balance irrespective of whether the jury credited the amount that Emerson or Ranger asserted at trial. Emerson contended that $48,177.53 remained under the subcontract and Ranger contended $58,600. Witnesses from both sides testified that, as of December 7, 2004, only "punch list" items remained. Pichardo, who was Ranger's corporate representative, testified that some of the open items on the December 7, 2004, observation report went beyond the contract specifications, and Ranger's expert Izbicki testified concerning labor costs per hour and his estimate of the hours to complete the open items on the observation report dated December 27, 2004. Ranger also presented evidence that showed that it continued to work at the job site after December 27, 2004; that Emerson's incurred costs with Northstar were unnecessary and unreasonable; and that Northstar was the fire suppression subcontractor responsible for the system beginning January 5, 2005. The jury could have credited this evidence to conclude that Ranger's cost to complete was minimal, that Ranger was excused from warrantying the fire suppression system, and that Ranger was not responsible for Emerson's incurred costs with Northstar.[7]

---

[6] Because we conclude that any error did not probably result in an improper judgment, we do not reach the issues of whether appellants preserved complaint on appeal or whether the trial court abused its discretion on this issue. *See* Tex. R. App. P. 47.1.

[7] On appeal, appellants conclude that the jury awarded the balance owed on the subcontract "offset by minor damages caused by Ranger."

Further, the parties raised and argued in their closing arguments the amount that the jury should reduce the subcontract balance based upon costs and alleged defects in the fire suppression system and the question addressing Emerson's damages instructed the jury to consider cost to complete or correct and losses due to Ranger's inadequate performance.[8] Viewing the evidence presented at trial, the parties' pleadings, and the charge in its entirety, we cannot conclude that any error in the trial court's failure to submit a separate question or to include an instruction concerning Ranger's cost to complete or correct its work probably resulted in an improper judgment. *See* Tex. R. App. P. 44.1(a); *Island Recreational Dev. Corp.*, 710 S.W.2d at 555. We overrule appellants' second, fourth, and sixth issues.

***Additional Jury Charge Complaints***

In their eleventh through fourteenth issues, appellants raise additional complaints concerning the jury charge. They contend that the trial court abused its discretion by refusing to submit a question to the jury as to whether Ranger substantially complied with the contract, by instructing the jury that Ranger's failure to comply was excused by Emerson's repudiation, and by refusing to submit three of Emerson's requested instructions. We address each contention in turn.

---

[8] In the event that the jury found that Emerson did not fail to comply with the subcontract or that Emerson's failure to comply was excused, the trial court instructed the jury to consider the following elements of Emerson's damages:

a. The reasonable and necessary cost to complete or correct those portions of the work that Ranger Fire failed to perform or inadequately performed, and

b. The losses due to Ranger Fire's failure to perform or inadequately perform its work.

19

*a)*     *Question on Substantial Performance*

For the same reasons that we have concluded that Ranger brought a valid breach of contract claim and did not seek damages under a substantial performance theory of recovery, we conclude that the trial court did not abuse its discretion by refusing to submit a question on substantial performance. *See* Tex. R. Civ. P. 278 (court to submit question and instructions "raised by the written pleadings and the evidence"); *Goose Creek Consol. Indep. Sch. Dist.*, 74 S.W.3d at 499.

*b)*     *Repudiation Instruction*

The trial court instructed the jury as to repudiation as follows:

Failure to comply by Ranger Fire is excused by Emerson Construction's prior repudiation of the same agreement.

A party repudiates an agreement when he indicates, by words or actions, that he is not going to perform his obligations under the agreement in the future, showing a fixed intention to abandon, renounce, and refuse to perform the agreement.

Appellants do not contend that these instructions were incorrect statements of the law but that they were not supported by the pleadings and evidence. *See Union Pac. R.R. Co.*, 85 S.W.3d at 166.

Ranger pleaded that Emerson did not give Ranger 72 hours to complete its work prior to replacing Ranger as required under the subcontract and "terminated Ranger Fire, removing its remaining materials from the site and refusing Ranger Fire further access to the site." Ranger also presented evidence that Emerson refused to perform its obligations under the subcontract, including refusing Ranger access to the job site without conditions and refusing to make any further payments

20

to Ranger. Raney, Emerson's project manager, stated in his January 3, 2005, letters, and testified at trial, that, among other conditions, Ranger would have to request permission in writing to return to the job site and would have to agree to report to another fire suppression contractor and to pay the cost of the other subcontractor. Raney also stated in his letters and testified that Emerson did not intend to make any further payments to Ranger at that time. Raney further testified that he decided to replace Ranger with another subcontractor, that he did not intend for Ranger to return to the job site after January 3, 2005, and that Emerson removed Ranger's materials from the job site prior to that day. He also was unable to point to a provision in the subcontract that allowed Emerson to place conditions on Ranger during the 72 hour period. Given this evidence and Ranger's pleadings, we cannot conclude that the trial court abused its discretion by including a repudiation instruction. *See In re V.L.K.*, 24 S.W.3d at 341 ("The trial court has considerable discretion to determine necessary and proper jury instructions.").

c) *Additional Requested Instructions*

Appellants also challenge the trial court's refusal to include the following instructions requested by Emerson with the question whether one or both parties failed to comply with the subcontract:

- In answering these questions, you are instructed that Emerson Construction's 72-hour notice letter to Ranger Fire, dated December 27, 2004, became effective as to the contents thereof three days after it was sent by Emerson Construction to Ranger Fire.

- Under the Subcontract Agreement, Emerson was not obligated to pay Ranger Fire until it received payment from the Owner. For purposes of this question, you are instructed as of January 3, 2005, Emerson had no obligation to pay

21

Ranger Fire its October, November, or December 2004 payment applications.

• A condition precedent to an obligation to perform is an act or event that occurs after a contract is made and that must occur before there can be a breach of contractual duty. Payment to Emerson Construction by Wal-Mart is a condition precedent to Emerson's obligation to pay Ranger Fire.

As to the instruction concerning the notice provision in the subcontract, Ranger pleaded that the applicable contractual provision was ambiguous, and a central factual dispute between the parties was whether Emerson complied with that provision procedurally and substantively. As to the required procedure for providing notice, witnesses from both sides agreed that the provision did not allow notice by facsimile. The disputed issues were whether sending notice by facsimile or certified mail substantially complied with the provision and, if so, when the notice was effective. Emerson contended that the 72 hour period began to run, at the latest, December 28, 2004, the next business day after it faxed the notice. Emerson presented evidence that it faxed the notice to Ranger on December 27, 2004, and mailed the notice the following day.[9]

Ranger contended that the notice provision did not allow Emerson to send notice by facsimile or certified mail; that Emerson should have sent the notice to Clay Shipman, not Daniel

_____

[9] To support their contention that notice by facsimile was effective as a matter of law on December 28, 2004, appellants rely upon *Texas Utilities Electric Co. v. Aetna Casualty & Surety Co.*, 786 S.W.2d 792, 793-94 (Tex. App.—Dallas 1990, no writ), and *Burlington Northern Railroad Co. v. General Protection Systems, Inc.*, No. 05-97-00425-CV, 2000 Tex. App. LEXIS 5253, at *15 (Tex. App.—Dallas 2000, no pet.) (mem. op., not designated for publication.). In contrast with the parties' dispute here, the issue of whether the notices sent by facsimile were actually received during the relevant time period was not disputed in those cases. *See Texas Utils. Elec. Co.*, 786 S.W.2d at 793 (party "admitted that its . . . office received the [60-day written] notice of cancellation"); *Burlington N. R.R.*, 2000 Tex. App. LEXIS 5253, at *15 ("There is no question, however, that the notice was sent and that [the party] received it and attempted to begin working on site.").

22

Shipman; that the earliest date that the 72 hour period began to run was January 3, 2005, the date Ranger actually received the notice; and that, in any event, the period should not have begun to run until Emerson returned Ranger's materials to the job site. It was undisputed that Ranger received the certified letter on January 3, 2005, and that Emerson removed Ranger's materials prior to January 3, 2005. Ranger also presented evidence that Emerson should have sent the notice to Clay Shipman, who was the primary contact between the parties and the signatory on the subcontract. Among other evidence, Mulkey, who was Emerson's project superintendent, testified that his primary contact was Clay Shipman and that the 72 hour period should run from the time that a subcontractor receives a notice letter.

The parties also disputed whether Emerson substantively complied with the notice provision. Ranger challenged Emerson's stated reasons for the notice and contended that the reasons were without justification and that Emerson improperly placed conditions on Ranger during the 72 hour period. Emerson notified Ranger that it had 72 hours to correct its "[f]ailure to complete the project as specified and scheduled" and its "[f]ailure to notify Emerson your work was not complete for the scheduled final inspection by the Owner." Raney testified that his reference in the notice letter to "schedule" was the November 2004 completion date that was provided by Ranger. Jim Smith, Wal-Mart's construction manager, however, testified that Ranger could not complete its work until other trades completed their work, and Ranger presented evidence that other trades had not completed their work as of December 27, 2004. Clay Shipman also testified that Ranger had a crew at the job site on January 3, 2005, and planned to complete the open items within 3 days, but

23

that Emerson required Ranger to agree to specified conditions before performing any more work at the job site.

Several witnesses testified that Emerson—not Wal-Mart or Ranger—scheduled the December 27, 2004, inspection, and Chuck Emerson, who was Emerson's president, testified that 30 days "could" be the industry standard to complete a punch list when time was not of the essence. Raney testified that Emerson's payment applications to Wal-Mart assumed that the open items would be complete by the end of December 2004 and, as to Emerson's own list of open items from Wal-Mart, Emerson was given several weeks. Given this evidence, we cannot conclude that the trial court abused its discretion by refusing to submit Emerson's proposed instruction concerning the 72 hour notice provision. *See In re V.L.K.*, 24 S.W.3d at 341.

We also cannot conclude that the trial court abused its discretion by refusing to submit Emerson's two other proposed instructions. *See id.* Those instructions focus on Ranger's open progress payment applications. Evidence showed that Emerson did not pay Ranger after Wal-Mart paid Emerson the corresponding amounts on January 11, 2005. The trial court within its discretion could have concluded that Emerson's proposed instructions tied to January 3, 2005, would not have been helpful to the jury or that the instructions were not necessary to enable the jury to render a verdict. *See* Tex. R. Civ. P. 278; *Union Pac. R.R. Co.*, 85 S.W.3d at 166; *Goose Creek Consol. Indep. Sch. Dist.*, 74 S.W.3d at 499. We overrule appellants' remaining issues challenging the jury charge.

*Sufficiency of the Evidence*

In their fifth and seventh through tenth issues, appellants challenge the legal and factual sufficiency of the evidence to support the jury's findings.

### a) Standard of Review

A legal sufficiency challenge may be sustained when the record discloses one of the following situations: (i) a complete absence of evidence of a vital fact; (ii) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (iii) the evidence offered to prove a vital fact is no more than a mere scintilla; or (iv) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In determining whether a finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. We indulge every reasonable inference that would support the finding. *Id*. at 822. When considering a factual sufficiency challenge, the reviewing court considers all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

### b) Jury's Breach of Contract Findings

In their seventh through tenth issues, appellants challenge the sufficiency of the evidence to support the jury's breach of contract findings. Appellants contend that (i) the evidence was legally and factually insufficient to support the jury's finding that Ranger's failure to comply

was excused; (ii) the evidence was legally and factually insufficient to support the jury's finding that Emerson breached the subcontract when the alleged improper acts are evaluated in accord with the subcontract; and (iii) if Emerson failed to comply with the subcontract, the jury's finding that Emerson's failure to comply was not excused was against the great weight and preponderance of the evidence and manifestly unjust.

Among their arguments, appellants assert that Ranger chose to continue performing after Emerson's alleged breaches, thereby forfeiting all excuses for its own breaches of contract. *See Gupta v. Eastern Idaho Tumor Inst., Inc*., 140 S.W.3d 747, 756-57 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (non-breaching party's treatment of a contract as continuing deprives non-breaching party of excuse for terminating own performance). Appellants further assert that this Court should limit its review of Emerson's actions to the time period December 27, 2004, to January 3, 2005, because Ranger continued to work on the project up to and including January 3, 2005. Appellants also assert that the subcontract provided that Emerson could supplement Ranger's work and that the evidence was conclusive that Ranger committed the first and only material breach of the subcontract by failing to perform its work in strict accordance with the plans and specifications.

The jury was asked to determine if one or both parties failed to comply with the subcontract in the same question with the following instruction on materiality:

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

a.      the extent to which the injured party will be deprived of the benefit which he reasonably expected;

26

b.      the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

c.      the extent to which the party failing to perform or offer to perform will suffer forfeiture;

d.      the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

e.      the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

The jury determined that both parties failed to comply.

The jury then was asked to determine in separate questions whether the respective party's failure to comply was excused. The trial court gave the jury the same instructions with the two questions. The jury was instructed that the failure to comply was excused "by [the other party's] previous failure to comply with a material obligation of the Subcontract Agreement." The jury also was instructed that a party's failure to comply was excused "if compliance is waived by [the other party]" or "by [the other party's] prior repudiation of the same agreement." In addition to defining repudiation as stated above, the trial court defined waiver as "an intentional surrender of a known right or intentional conduct inconsistent with claiming the right." The jury found that Ranger's failure to comply was excused and Emerson's failure to comply was not excused.

Viewing the evidence in the light most favorable to the challenged jury findings, evidence surrounding the parties' actions from December 27, 2004, through January 3, 2005, supports the jury's breach of contract findings. Evidence, including the letters exchanged between the parties, supports findings that: (i) the parties continued to try to work on the project together

27

prior to December 27, 2004, (ii) at that time only "punch list" items remained to complete the fire suppression system and there was a balance owed under the subcontract; (iii) no one from Emerson notified Ranger employees that were on the job site on December 27, 2004, about the notice letter and Raney did not attempt to contact Clay Shipman until Shipman called him on January 3, 2005; (iv) Ranger received actual notice of the 72 hour letter on January 3, 2005; (v) Ranger was unable to continue working at the job site after January 3, 2005, because, among the reasons, Emerson had removed Ranger's materials, and (vi) Ranger remained willing and able to do whatever was required to complete the open items within 72 hours on January 3, 2005, but Emerson refused to allow it do so without Ranger agreeing to certain conditions, such as paying the costs of the supplementing subcontractor.

Among other evidence, Clay Shipman testified that, because he was involved in the project from beginning to end, the 72 hour notice should have been sent to his attention, that Ranger actually received the notice on January 3, 2005, that Ranger could have completed the open items in 72 hours if it had been given the chance, and that Ranger was willing to do whatever was necessary to complete the open items. Raney testified that it was his decision to replace Ranger, that Emerson placed conditions on Ranger to continue working on January 3, 2005, and that Emerson "secured" Ranger's materials and that Ranger's employees "actually came to take them, but they were not going to be able to get to them."

Ranger also presented evidence that industry standard allowed 30 days to complete punch lists when time was not of the essence, that a subcontractor should be given a reasonable amount of time to complete a punch list, that the subcontract did not allow Emerson to place

28

conditions on Ranger during the 72 hour period, and that other trades' work was not completed to allow Ranger to complete its work. Crediting this evidence, the jury could have concluded that Emerson's actions surrounding its notice letter failed to comply with the subcontract and that Emerson's failure to comply was material and that, although Ranger failed to comply with the subcontract after January 3, 2005, by not completing its work or issuing a warranty, it was not required to do so based upon Emerson's previous material breach.

Appellants contend and presented evidence to support findings that Emerson substantially complied with the notice provision in the subcontract, that Ranger scheduled the December 27, 2004, inspection, and that Ranger materially breached the contract with defective and incomplete work. Appellants contend that sending the notice by facsimile to Ranger was effective as actual notice at the latest beginning on December 28, 2004, so that the 72 hour period expired on December 31, 2004. Appellants also presented evidence to support findings that: (i) Ranger did not substantially complete its work; (ii) the progress of other trades' work did not prevent or delay Ranger from completing its work; (iii) the notice provision allowed Emerson to supplement Ranger's work, to charge Ranger for the supplementation, to bar Ranger from the job site, and to take over Ranger's work; (iv) Ranger abandoned the project after being notified that Emerson would be supplementing Ranger's work; and (v) Emerson had no choice but to hire Northstar to complete the fire suppression system after January 3, 2005.[10]

---

[10] Among other evidence, Raney testified that the "schedule" he referenced in the 72 hour notice letter was the November completion date provided by Ranger; that he had no confidence that Ranger could complete its work based upon its progress from December 7 to 27, 2004; and that it was not Emerson's intent to "kick" Ranger off the job but to assist or supplement Ranger's work because "[t]hey obviously didn't have the folks to get it done, so we were trying to help them."

29

Appellants focus on the open items on the December 27, 2004, observation report and, in particular, the following highlighted sentence on the first page of the report:

> ***The number of non-compliant issues are too many to list. Please review the report thoroughly as many items represented both Life Safety and Code violations. Much of the sprinkler system work is still on-going.***

Among other evidence, Emerson's expert Reed testified about the observation report and his opinions that Ranger did not substantially complete the fire suppression system, that the work that it did complete was defective, and that the open items on the observation report were significant. Raney also testified about and addressed the open items in his January 3, 2005, letters. In the letters, Raney states that "one zone of the building not in operation with numerous [sprinkler] heads throughout the store not installed," that Ranger "scheduled" the December 27 inspection but was not prepared, and that Ranger "offered the same crew that has been trying to complete the work." Pierce, the BSW International inspector, also testified that he generated the two observation reports on December 7 and 27, 2004, after inspecting the fire suppression system and that his notation on the reports that "work is ongoing" referred to the fire suppression system. Emerson also presented evidence showing Northstar's costs to remedy alleged defects, such as coupons in the system, and Wal-Mart's charges for flood damage.

Documents and other witnesses' testimony, however, supported findings that Ranger had completed its obligations under the subcontract except for punch list items, that other trades' work remained to be completed on December 27, 2004, and that Emerson scheduled the December 27, 2004, inspection. The documentary evidence included Emerson's written

30

representation to Wal-Mart that the project was substantially complete, and it was undisputed that Emerson issued its warranty on December 13, 2004. Wal-Mart was issued a temporary certificate of occupancy at that time and took possession of the store on that day. Mulkey also testified that Ranger was "close to complete" on December 13, 2004, and Izbicki provided a contrary expert opinion to Reed's opinion concerning the scope of the open items on the observation report. Smith, who was the construction manager for Wal-Mart, further testified that, based upon Wal-Mart's inspection report dated January 3, 2005, that there were only "minor punch list items that remained" on January 3, 2005 and agreed "that's typical."[11] Photographs taken on December 13, 2004, as well as January 3, 2005, also were admitted into evidence.

Appellants discount the documentation showing that the fire suppression system was substantially or "100%" complete, as well as the testimony from Mulkey and Smith, arguing that Wal-Mart and Emerson are not fire suppression experts and that it was within the sole purview of BSW International to determine when the system was substantially complete under the terms of the subcontract. Izbicki's testimony, however, supports the determination that the fire suppression system was complete except for punch list items. Moreover, even if we were to conclude that the fire suppression system was not substantially complete on December 27, 2004, as that term is defined in the subcontract, that conclusion would not be dispositive. Ranger presented evidence that supports the jury's breach of contract findings whether or not BSW International accepted Ranger's work as substantially complete.

_____

[11] Smith testified by video deposition. He visited the job site every few weeks and prepared corresponding inspection reports.

Several witnesses, including Smith and Pichardo, who was Ranger's corporate representative, testified that the completion of Ranger's work depended on the completion of other trades' work. Smith testified that Wal-Mart had to complete wiring and the construction of tire racks after Wal-Mart took possession on December 13, 2004, before Ranger could finish its work, such as testing the system. Smith testified that the tire rack construction period typically was five to five and one-half weeks. Pichardo, who was present for the December 27, 2004, inspection, testified that the notation next to certain items on the observation report that "work is ongoing" meant that other trades' work was preventing Ranger from completing its work. Finally, Pichardo, as well as other witnesses, testified that Emerson scheduled the December 27, 2004, inspection.[12] The jury could have credited this evidence to conclude that other trades' work was not complete on December 27, 2004, and that Emerson scheduled the inspection prematurely.

It was within the province of the jury to resolve the conflicts in the evidence. *See City of Keller*, 168 S.W.2d at 819-20; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761

---

[12] In its briefing to this Court, appellants assert that Clay Shipman testified that Ranger notified Emerson that it was ready for the December 27, 2004 inspection, and that it was in agreement concerning when the inspection should be scheduled. Clay Shipman, however, testified in relevant part:

Q.    Okay. Just a minute ago, Mr. Shipman, you testified that Ranger Fire was in agreement that this final inspection—that its work was ready for final inspection.

A.    No. I mean we didn't schedule—I mean the final inspection we—in order for us to—I didn't even know if we scheduled these inspections. I think Emerson did. But I mean we would have known that unless other things were done, we couldn't be ready. I mean there needed to be, you know, things in place.

(Tex. 2003) (jury remains sole judge of witnesses' credibility and weight to be given their testimony); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury can choose to believe one witness over other witnesses or resolve inconsistencies in their testimony). Given the conflicting evidence, the jury could have concluded that Emerson materially breached the subcontract by its actions from December 27, 2004 to January 3, 2005; that Ranger complied with the subcontract until January 3, 2005, the last day it was at the job site; and that Ranger's failure to comply after January 3, 2005, was excused based upon Emerson's prior material breach. *See Mustang Pipeline Co.*, 134 S.W.3d at 196.

We conclude that the evidence was legally and factually sufficient to support the jury's findings that Emerson failed to comply with the subcontract and that Ranger's failure to comply was excused. *See City of Keller*, 168 S.W.3d at 810. We also conclude that the jury's finding that Emerson's failure to comply was not excused was not against the great weight and preponderance of the evidence or manifestly unjust. *See Cain*, 709 S.W.2d at 176. We overrule appellants' seventh through tenth issues.

### c)    Jury's Damages Finding

In their fifth issue, appellants contend that there was no evidence or insufficient evidence to support awarding Ranger 100% of the unpaid subcontract balance. But, whether the jury credited the subcontract balance proposed by Emerson or Ranger, the jury did not award 100% of the unpaid subcontract balance, and it was within its province to weigh the evidence concerning costs to complete after January 3, 2005, and to resolve the conflicts in the evidence in favor of Ranger. *See Kuhlmann*, 722 S.W.2d at 697. Further, the jury generally has discretion to award damages

within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002); *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied). "So long as a rational basis for the calculation of damages exists, a jury's finding will not be disregarded merely because its reasoning at arriving at its figures may be unclear." *Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied).

The parties presented conflicting evidence of what amount, if any, Emerson owed Ranger under the subcontract. Clay Shipman testified that Ranger was owed approximately $40,000 plus retainage under the subcontract. Raney and Chrisha Potter, Emerson's controller, testified that Ranger owed Emerson after Emerson's costs for defective and incomplete work were offset against the remaining subcontract balance. Emerson sought offsets for alleged failures in the system that caused leaks and damage to Wal-Mart's merchandise. Raney, however, also testified that "[w]e'll never know" what Emerson's costs would have been had it allowed Ranger 72 hours without conditions.

Given the conflicting evidence, we conclude that the jury's award in the amount of $44,897.53 was within the range of evidence presented at trial. *See Gulf States Utils. Co.*, 79 S.W.3d at 566; *Mayberry*, 948 S.W.2d at 317. We overrule appellants' fifth issue.

### *Attorney's Fees and the Jury's Take Nothing Verdict*

In their fifteenth through seventeenth issues, appellants challenge the jury's take nothing verdict on Emerson's breach of contract claim and the attorney's fees award. Appellants contend that Ranger should take nothing and that the judgment should be reversed and judgment rendered awarding appellants their stipulated attorney's fees. The parties stipulated to the following

34

amounts as reasonable and necessary attorney's fees: (i) $342,000 with regard to Ranger's contract claim, (ii) $288,000 with regard to Emerson's contract claim, and (iii) $12,000 with regard to Emerson's defense of Ranger's fraud claim. The trial court awarded Ranger attorney's fees in the amount of $330,000.

Appellants contend that Ranger cannot recover attorney's fees pursuant to chapter 38 of the Civil Practice and Remedies Code, *see* Tex. Civ. Prac. & Rem. Code § 38.001, because Ranger did not have a valid breach of contract claim. Appellants also rely on the provision in the subcontract that provides that Ranger, if Emerson "successfully defends any cause of action filed by [Ranger], [agreed to] pay [Emerson] the amount of its reasonable attorney's fees and costs and expenses incurred in the . . . defense of any such suit by [Ranger]." There was no corresponding provision in the subcontract to support an award of attorney's fees to Ranger.

The availability of attorney's fees is a question of law which we review de novo. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999). On the other hand, we review the amount of a trial court's award of attorney's fees for abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004); *Downer*, 701 S.W.2d at 241-42.

For the same reasons that we conclude that Ranger brought a valid breach of contract claim and that the evidence supports the jury's finding that Emerson failed to comply with the subcontract, we also conclude that the trial court did not abuse its discretion by awarding Ranger attorney's fees in the amount of $330,000. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (party may recover attorney's fees if claim is for oral or written contract); *Graybar Elec. Co., v. LEM & Assocs., L.L.C.*, 252 S.W.3d 536, 549 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (within trial court's

discretion to set amount of attorney's fees award under section 38.001). Consistent with the subcontract provision requiring Ranger to pay incurred attorney's fees in the event that Emerson successfully defends a cause of action, the trial court reduced the award to Ranger by $12,000, the amount of stipulated attorney's fees with regard to Emerson's defense of Ranger's fraud claim. We overrule appellants' fifteenth through seventeenth issues.

## CONCLUSION

For these reasons, we affirm the trial court's judgment.

_____

Melissa Goodwin, Justice

Before Chief Justice Jones, Justices Henson and Goodwin;
   Justice Henson Not Participating

Affirmed

Filed: August 29, 2013